IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 28, 2016

## BRIAN KEITH GOOD v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Sullivan County**
**No. C62924    James F. Goodwin, Jr., Judge**

---

**No. E2015-01736-CCA-R3-PC – Filed October 28, 2016**

---

The Petitioner, Brian Keith Good, appeals from the post-conviction court's denial of relief from his convictions for criminally negligent homicide, attempted aggravated robbery, and unlawful possession of a deadly weapon.[1]  On appeal, he argues that he received ineffective assistance of counsel based on trial counsel's (1) failure to adequately investigate and discover a witnesses' third statement in preparation for trial and (2) failure to call Anthony Branche and Mark Tolley as defense witnesses.  Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., J., joined.  ROBERT H. MONTGOMERY, JR., J., not participating.

Cliff Corker, Johnson City, Tennessee (at post-conviction hearing), and Ilya I. Berenshteyn, Bristol, Tennessee (on appeal), for the Petitioner, Brian Keith Good.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Barry P. Staubus, District Attorney General; and William B. Harper, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

In January 2006, the Petitioner was charged by presentment to the Sullivan County Grand Jury with first degree felony-murder, attempted aggravated robbery, and the unlawful possession of a weapon.  State v. Bryan Keith Good, No. E2009-00926-CCA-R3-CD, 2010 WL 3706625, at *1 (Tenn. Crim. App. Sept. 23, 2010), perm. app. denied

---

[1] Although the presentment initiating the charges against the Petitioner in this case spells his name as "Bryan Keith Good," we note that the petition for post-conviction relief and all documents related to this matter spell his name as "Brian Keith Good."

(Tenn. Nov. 27, 2012).   Following a jury trial on July 9, 2008, the Petitioner was convicted of criminally negligent homicide, attempted aggravated robbery, and unlawful possession of a deadly weapon.   The trial court sentenced the Petitioner as a Range III, Persistent Offender to fifteen years for the attempted aggravated robbery conviction and to six years for each of the remaining convictions, to be served consecutively, for an effective sentence of twenty-seven years' incarceration.   Id. at *9.   On direct appeal, this court affirmed the Petitioner's convictions but remanded for resentencing after concluding that the convictions for both attempted aggravated robbery and unlawful possession of a deadly weapon violated double jeopardy protections.   Id. at *11.   The Petitioner's convictions for attempted aggravated robbery and unlawful possession of a deadly weapon were merged, which resulted in an effective sentence of twenty-one years' incarceration.

Upon determining that appellate counsel was deficient in failing to file an application for permission to appeal, the trial court granted the Petitioner a delayed Rule 11 appeal, which was subsequently denied by the Tennessee Supreme Court.   On November 15, 2013, the Petitioner filed the present pro se petition for post-conviction relief, alleging, inter alia, that he received ineffective assistance of trial counsel.   After determining that the Petitioner stated a colorable claim for relief, the post-conviction court appointed counsel, but no amended petition was filed.

The underlying facts of the Petitioner's conviction were summarized by this court on direct appeal.   See id. at *1-9.   We will include only those facts pertinent to the issues raised in this appeal.   On the evening of August 12, 2005, Joshua Branche went to the home of Brandon Mottern, the victim, after observing two people, later identified as the Petitioner and his co-defendant, Gregg Nutter, trying to break into his apartment at Graystone Apartments in Washington County, Tennessee.   Around 4:00 a.m. on August 13, 2005, Joshua Branche's brother, Anthony Branche, and his girlfriend, Laura Carrier, were at their home at 932 Allison Road when their dog began to behave strangely, prompting Anthony Branche to look out the window.   Anthony called his brother, Joshua, who along with the victim, immediately drove to Anthony's house on Allison Road in the victim's car.   As they approached the house, Joshua saw people in dark clothing that he did not recognize standing outside the side door.   As the victim pulled into the driveway, he pulled the emergency brake, jumped out of the car, and started chasing the suspects into a field behind the house.   Joshua ran to the door, yelling for his brother.   Anthony ran out of his house and followed after the suspects behind the victim.   Id. at *2-4.

After hearing a truck start, the Branche brothers got into the victim's car to follow the truck and to get the tag number.   They saw the truck drive through the field behind the house and followed it for "[p]robably a half a mile, maybe a mile."   Joshua recognized the truck as belonging to the Petitioner.   As they followed the truck, he "heard

loud noises and [saw] flames coming from the truck[,]" so he turned around and went back to his brother's house. When they got back to Anthony's house, he asked where the victim was, but neither Anthony nor Carrier realized that anyone had been with him when he arrived. They took flashlights and began to search for the victim and, after around five minutes, Joshua found the victim lying on his back in the field. He did not get close enough to see whether the victim had any injuries but immediately called 911. It was later determined that the victim died as a result of a close-range shotgun wound to his chest. He had a closed pocket knife in his hand, and a crowbar was located around ten feet from his body. Id. at *3.

Joshua testified that Anthony left the field while he waited near the road for law enforcement to arrive, but he did not know where he went. He further testified that he did not know what Anthony was doing while he was driving behind the Petitioner's truck. He denied that either he or the victim was armed when they left the victim's house. He did not know the victim to normally carry a weapon and did not see any weapons in the victim's car. He also noted that the Petitioner came to his apartment one to two weeks prior to the victim's death, asking him where Anthony was. Joshua explained that Anthony used illegal drugs, which was why he did not speak with him often. Id. at * 3.

On cross-examination, Joshua testified that he did not know whether Anthony sold drugs, but Anthony did not work and always had money. Joshua was repeatedly questioned concerning whether he, the victim, or his brother had a weapon during the offense. The following exchange occurred between defense counsel and Joshua:

Q: Now, did your brother -- did your brother have any guns at his house?

A: I never seen none. I'm not allowed to be around guns.

Q: You've sold my client a gun in the past, haven't you?

A: I ain't never owned a gun.

. . .

Q: Because you're not supposed to be around them because you're a convicted felon, aren't you?

A: Yes, sir.

Q: All right. So if you had a gun you probably wouldn't tell me that you had it, would you?

A: I ain't never owned a gun. I have never shot a gun.

Q: All right. Your brother, was he a convicted felon also?

A: Yes, sir.

Q: He's not supposed to have guns either, is he?

A: No, sir.

. . .

Q: All right, sir. Now you all pull up, take off running. Is your brother outside shooting when you pull up?

A: I didn't see him with no gun. No, sir.

Q: You once made the statement, I believe, that you've never heard a gunshot except for on television. Is that what you'd have this jury to believe, sir?

A: I've never been around a gun, period.

Q: And that's what you want the jury to believe, sir?

A: That's what I said. I mean, yeah.

Q: All right, so you're there and you pull up and [victim Mottern] -- and had you seen his knife before?

A: I never seen him carry a knife.

Q: You knew he had a knife in his hand when he got out chasing these people, didn't you?

A: No, sir.

. . .

-4-

Q: When you got out there and [your brother] came outside, do you deny that you or he shot at the people in the field?

A: I never seen nobody with a gun. No, sir.

Q: All right. Now at that point you got in [victim Mottern's] car and went and chased these people?

A: When I heard the truck start and leaving the field.

Q: And your brother got in the vehicle with you?

A: Yes, sir.

. . .

Q: All right. And you all go down -- do you deny shooting at the vehicle that you're chasing?

A: I -- no, sir, I didn't.

Q: Did your brother?

A: I don't know if he did or not.

Q: Well, did you ever make the statement to somebody that -- that you would have got those boys but you run out of bullets?

A: No, sir, I didn't.

Q: Do you deny making that statement, sir?

A: I didn't make no statement like that to anybody. I don't even own a gun.

Laura Carrier had lived with Anthony Branche for two and a half years and confirmed that there were no guns in the house. Moreover, she said that Anthony was not armed when he left and denied hearing any gunshots or unusual noises before leaving their house.[2] Peggy Ramey and her boyfriend, Mike Compton, both friends of the Petitioner, confirmed that the Petitioner brought his co-defendant, Gregg Nutter, to their

---

[2] At the time of trial, Carrier was deceased. Her testimony was read into the record.

house on August 12, 2005. On Sunday, August 14, 2005, Ramey noticed that the shotgun she normally kept in her spare bedroom closet was in a corner of her bedroom and a bag of shells was on her bed. The 12-gauge shotgun, 12-gauge shells, and one spent 12-gauge shell were collected as evidence. The shotgun wadding recovered from near the scene was determined to be consistent with the shotgun shells from Ramey's residence.

The Petitioner, along with his co-defendant Gregg Nutter, testified at trial, both providing slightly different versions of the events leading up to the victim's death. The most significant distinction between their testimony was that Nutter testified that the Petitioner shot the victim, while the Petitioner testified that Nutter shot the victim. Nutter, who had entered an agreement with the State to plead guilty to facilitation of first degree murder in exchange for an eighteen-year sentence, testified, as relevant here, that the Petitioner wanted to go to the Branche brothers' homes to get money or drugs because the Branche brothers owed the Petitioner money. The Petitioner and Nutter returned to Anthony Branche's home a second time that night and parked his truck in the adjacent field. Upon exiting the truck, the Petitioner was armed with a shotgun obtained from Ramey's home and gave Nutter a small loaded pistol. After walking around the house, the Petitioner went onto the porch. At that point, they saw headlights and ran through the field towards the truck.

Nutter testified that he heard footsteps behind them, and a young man said either "'I'll cut you, motherf* * *er' or 'I'll gut you, mother-f* * *er.'" Nutter looked over his shoulder and saw the Petitioner turn and fire the shotgun. As they got into the Petitioner's truck to drive away, a vehicle began chasing them, and someone in the vehicle was shooting at them. The Petitioner told Nutter to shoot back, and Nutter took the shotgun and tried to fire it out of the window. He said that the empty shell had not been cleared, so he ejected the shell and reloaded. He testified that he did not know where the empty shell went. He fired the shotgun at the vehicle behind them. The vehicle stopped following them, and they returned to Ramey's house. The Petitioner told him that he might have "peppered" the man in the field and gave him a story to tell anyone who asked where they had been. The next Monday, the police interviewed Nutter, who gave the police three statements. He lied in the first statement, told the partial truth in the second statement, and told the full truth in the third statement. Id. at *4-5.

The Petitioner testified that on August 12, 2005, he had purchased marijuana from Joshua Branche. The Petitioner took marijuana and Xanax pills to Nutter's house. While the Petitioner was at Nutter's house, Joshua Branche called him to ask whether he knew anyone he could sell marijuana to and to tell him that someone had broken into his apartment and stolen marijuana. The Petitioner and Nutter talked about the Branche brothers after Joshua Branche called because Nutter knew Anthony Branche. The

Petitioner testified that Nutter asked him four or five times to take him to Joshua Branche's apartment and that Nutter discussed with his wife the possibility of getting marijuana from Branche and selling it. After the Petitioner showed Nutter where Joshua Branche's apartment was, the Petitioner went back to Ramey's house because he did not want to be involved with stealing marijuana from Branche. The Petitioner said that Nutter went back to Joshua Branche's apartment alone, found it empty, and returned to Ramey's house.

The Petitioner said that Nutter then wanted the Petitioner to take him to Anthony Branche's home. They went to Anthony Branche's home, parked in a field, and got out of the truck. They walked to the house, heard the dog barking, ran back to the truck, and eventually returned to Ramey's house to borrow her shotgun for protection from the dog. The Petitioner retrieved a .9 millimeter pistol that he had hidden in a tool box at a friend's house, but Nutter did not want to carry the pistol because it was in poor condition. They returned to Anthony Branche's home a second time in the Petitioner's truck. While they went around to the back of the house, the Petitioner was carrying the .9 millimeter pistol in his overalls, and Nutter was carrying the shotgun. They heard a car coming, and they went back to the truck. The Petitioner said he was in the tree line by the time the car pulled into the driveway, but Nutter was hiding in bushes near the house.

They both began running when the car pulled into the driveway. The Petitioner heard gunshots fired at them, and a loud gunshot behind him. The Petitioner testified that "[he] figured [Nutter was] shooting back at these guys . . . [that were] shooting at [them]." They got into the truck, and Nutter told the Petitioner that he thought he shot someone. When they drove away, a car followed them. The Petitioner testified that the occupants of the car began shooting at them. Nutter said "something about shooting them," and the Petitioner told him that he should shoot back. Nutter had to eject a shell from the gun before he could shoot. He put the ejected shell in his pocket and fired back at the car following them. Id. at *7-8.

Gary Daugherty, who was incarcerated with Nutter after Nutter's arrest, testified that Nutter told him that he shot a man in self-defense because that man was trying to cut him. Andrew Atkins testified that Nutter told him that the Petitioner "would take the fall for this shooting[.]" He said that the conversation took place in the Washington County Detention Center. Atkins testified that he was a friend of the Petitioner's younger brother and that he knew Nutter because they were previously neighbors. He also said that he knew Anthony and Joshua Branche and that they had a reputation as drug dealers who always armed themselves.

Anthony Branche did not testify at trial.

**Post-Conviction Hearing.**  At the March 11, 2015 evidentiary hearing, Anthony Branche testified that on August 13, 2005, he was at his house on Allison Road in Sullivan County with his then girlfriend, Laura Carrier, and a friend.  At around 2:00 a.m., he woke to the sound of his dog barking.  He walked downstairs, turned on his porch light, and saw two men standing outside his house.  He testified that both of the men wore masks and that one of the men had glasses and was carrying a gun.  Anthony said that he retrieved a gun from inside his house upon seeing the men, but he denied being afraid of them.  He then called his brother, Joshua Branche, and Joshua arrived with the victim at Anthony's house approximately ten minutes later.  Anthony was on the phone with Joshua as Joshua and the victim pulled into the driveway, and Joshua stated that there were two men at the back door.  Anthony then ran outside and saw the victim chasing the two suspects into a nearby field.  Anthony, still carrying a gun, fired a couple of shots into the field.  Several shots were fired back, but Joshua told Anthony to stop shooting because the victim was in the field.

Anthony then took off running into the field.  He testified that he was still carrying a gun and that the victim had been carrying a knife, though he did not know about the knife until later.  When he caught up to the other men, he saw "a flash" of gunfire as the suspect with glasses shot the victim.  He noted that the second suspect was already gone by that point and that he never saw the second suspect with a gun.  He also testified that the shooter was shorter than the second suspect.  After the victim was shot, Anthony observed both suspects get into a truck.  He then "t[ook] off back to [his house]" and got into the victim's car with Joshua, and they chased the suspects' truck down the road for a while.  He returned gunfire when the man with glasses leaned outside of the truck and shot at them.  He estimated that they fired back and forth for about a mile and that he fired about eight to ten shots.

Anthony testified that he and Joshua eventually stopped pursuing the truck and returned to his house.  They got a flashlight and went to the field to look for the victim.  When they found the victim, he was already dead.  Joshua then called 911.  When police arrived, Anthony told them about the victim's shooting but did not disclose that he had been firing a gun or that the victim's shooter was wearing glasses.  He said that the police came back to his house a few days later and arrested him on a warrant for false reporting, felony reckless endangerment, and unlawful carrying of a firearm.  He later pled guilty to those offenses.  He noted that these charges were based on statements he and his brother made to police, which were summarized in his affidavit of complaint.

The supporting facts cited in the affidavit of complaint, written and signed by Detective Simpson, were as follows:

On 08-13-05 units from the Sullivan County Sheriff's Office were dispatched to 932 Allison Road, Piney Flats, TN on a burglary and a possible homicide. Upon their arrival officers found a male subject laying in a field adjacent to the residence with a single gunshot wound to the chest. The subject was deceased when the officer's arrived.

On 08-13-05 writer interviewed Mr. Anthony Lee Branche and he advised that someone had attempted to break into his home and he had called his brother, Joshua Branche, to come to his home. Mr. Branche advised that upon his brother['']s arrival he had brought with him a Mr. Brandon Mottern. Upon th[ei]r arrival, Mr. Mottern and Joshua Branche saw three subjects outside the home[.] Brandon Mottern exited his vehicle and pursued the subjects on foot into the field. Mr. Branche advised that he heard two or three gunshots and he saw a vehicle's lights come on while driving out of the field to the road. He stated that at this time he and his brother got into his vehicle and chased the vehicle down Allison Road. He stated that they chased the vehicle until the persons in the truck started shooting back at them. Mr. Branche advised that at this time they turned around and drove back to the house and shortly thereafter found the body of Mr. Mottern in the field adjacent to the house.

On 08-15-05 writer interviewed the brother of Anthony Branche. His name is Joshua Branche. He stated that on the morning of 08-13-05 when he and his brother started pursu[]ing the vehicle down Allison Road Anthony was not driving the vehicle but he was driving Mr. Mottern's vehicle and that his brother Anthony was the passenger. He stated that Anthony was hanging out the passenger side window and had a small pistol in his hand. He stated that Anthony was firing the gun at the people in the vehicle. Joshua stated that when the people started firing back he stopped chasing them because he did not want to get shot.

Writer obtained a copy of Mr. Anthony Branche's criminal history and found him to be a convicted felon. Based on the above information he was charged with False Reporting, Felony Reckless Endangerment, and Unlawful Carr[y]ing of a Firearm. All of the above occurred in Sullivan County, TN.

Anthony confirmed that he gave no other statement to police besides the one he gave on the night of the offense and that he was never called to testify at the Petitioner's trial. He further claimed that he was never contacted or interviewed by the Petitioner's

-9-

attorney or investigator. He testified that he would have given the same description of the offense that he had given at the post-conviction hearing if he had been called to testify at trial. He further agreed that if Joshua had testified at trial that there was no gun involved, it would have been a false statement, and he repeated that there was both a knife and gun involved.

On cross-examination, Anthony conceded that he did not tell law enforcement the whole truth on the night of the offense. He did not recall refusing to talk or meet with the Petitioner's investigator in jail on June 20, 2007. He noted that he knew the Petitioner prior to the victim's shooting in August 2005 but had never met the Petitioner's co-defendant. However, he denied that he and the Petitioner had ever discussed the details of the case. Moreover, he admitted that he had pled guilty on September 24, 2005, to the second degree murder of Laura Carrier. In relation to that case, he also pled guilty to tampering with evidence and possession of a Schedule II drug for resale. In response to questions raised by the court, he admitted that he had felony convictions prior to August 2005 for "a couple of auto burglaries and two sales of [a] Schedule VI [drug]."

Trial counsel testified that he was aware that Anthony Branche was a victim in the Petitioner's case. Counsel's case file indicated that on June 20, 2007, his investigator attempted to meet with Anthony, but Anthony refused to talk to him. Counsel made no further attempts to speak with him because his investigator indicated that there was no point. Counsel conceded that Joshua Branche testified at trial that there was no gun involved on the night of the offense. Counsel said that he had two prior statements by Joshua from August 13, 2005, neither of which claimed that Anthony was firing shots during the offense. He confirmed that these were the only two statements he had from Joshua. He further noted that his investigator attempted to meet with Joshua on June 27, 2007, but Joshua's attorney had advised him not to speak with the investigator.

When asked about a third statement by Joshua from August 15, 2005, counsel responded, "To my knowledge I don't have it in my file and I'm not aware of it." Counsel claimed that he was aware of Anthony Branche's affidavit of complaint, which referenced Joshua's August 15 statement that mentioned the involvement of guns, but he was unsure of whether he was provided a copy of the affidavit. However, counsel had written in his notes that Joshua "gave up to three different stories," and he had "summaries of what [Anthony] Branche said." Counsel testified that he was aware that Anthony had pled guilty the year before the Petitioner's trial to possession of a firearm on the night of the offense. Furthermore, he said that "[he] remember[ed] all through the trial [he] had a lot of notes that, you know, 'Where is [Anthony][?]'"

Counsel testified that he felt the jury discounted Joshua Branche's testimony that there were no guns involved. Counsel recalled that he and the Petitioner spoke about the

testimony of Joshua and Anthony Branche being unreliable, and they agreed that "you couldn't trust what they would testify to." Counsel felt that the overall result of the Petitioner's trial was favorable because the jury believed that the Petitioner was not the shooter and therefore convicted him of the lesser offense of negligent homicide.

On cross-examination, counsel testified that he had been practicing law for almost thirty years, with a large part of his work in criminal defense. He claimed that he was well aware of Anthony Branche's criminal history before trial and, given the history of both Joshua and Anthony Branche, he "didn't know which version of the stories they would give" at trial. He testified that Joshua was cross-examined and impeached at both the Petitioner's preliminary hearing and trial for giving multiple different descriptions of the offense. Counsel further stated that the two pivotal issues at the Petitioner's trial were the testimony of the Petitioner's codefendant, Nutter, and the location of the crowbar found at the crime scene. He said their defense strategy was that the Petitioner was not the shooter and that Nutter was the only witness that testified against this assertion.

On cross-examination, counsel also testified that he pointed out several times during trial that the State did not call Anthony Branche as a witness. Counsel testified that his decision not to locate or call Anthony as a defense witness at trial was a strategic choice. He explained,

> I thought I could get more mileage out of, you know, why the State did not call him as a witness because of what he may or may not testify to because it was --- he was a wild card.
>
> . . .
>
> If the victim is not there from my strategy standpoint[,] I didn't want them there if the State wasn't going to have him.

On redirect examination, counsel stated that Anthony's testimony would not likely have changed the result of the Petitioner's trial because it was undisputed that the Petitioner was present during the victim's murder.

The Petitioner, testifying on his own behalf, stated that "[he] like[d] [trial counsel]" and had "no problem with him." He admitted that trial counsel hired a private investigator, allowed the Petitioner to get a polygraph, and "actually tried," but "just [did]n't think he --- what happened was right, you know." He testified that he spoke to trial counsel about Joshua Branche's third statement to law enforcement but that the statement was never obtained. The Petitioner said that he knew there was a third

statement because it was stated during his preliminary hearing that there were three statements, and the Petitioner "[had] been trying to get that third statement ever since."

The Petitioner further testified that trial counsel did not call Mark Tolley, Nutter's cellmate for four or five months, to testify at trial. The Petitioner explained that Nutter told Tolley that he shot the victim and counsel obtained a statement from Tolley to police about what Nutter told him. However, when they attempted to call Tolley at trial, he refused to testify because "[h]e was scared to come at the time because he was in prison and afraid they'd get him for snitching." Although the Petitioner admitted that it was not counsel's fault that Tolley would not testify, he thought that counsel should have subpoenaed Tolley as a witness based on the statement Tolley gave police. The Petitioner suggested that Nutter had also "bragg[ed]" about killing the victim to several other inmates.

In addition, the Petitioner testified that there was no evidence brought out at trial to contradict the false testimony of Joshua Branche. He emphasized that Anthony Branche's affidavit of complaint contained a statement by Joshua admitting that Anthony was hanging outside of the window of their vehicle shooting at the Petitioner. Moreover, he said that he did not know that Anthony Branche pled guilty to unlawful possession of a gun on the night of the offense but that trial counsel should have known about the conviction and brought this information out at trial. The Petitioner also noted that the State, despite knowing about the statements contained in the affidavit of complaint and knowing about Anthony's firearm conviction, allowed Joshua to testify falsely at trial that neither he, nor the victim, nor Anthony had a gun during the offense. Moreover, even though the Petitioner testified at trial that he had been shot at, he felt that it would have helped to be able to show the jury that Anthony Branche, in fact, pled guilty to unlawful possession of a firearm, in contrast to the trial testimony of Joshua Branche.

The Petitioner agreed that he and trial counsel discussed the testimony of Anthony Branche but that he "didn't know why the State wasn't calling him." However, the Petitioner admitted that he was not sure what Anthony Branche would have said at trial. The Petitioner also testified that he had never worn glasses, but that Nutter did wear glasses and that he was "about 4, maybe 5 inches taller" than Nutter. He confirmed that he did not testify at trial that he did not wear glasses. He noted, however, that he would have gotten into that had he known that Anthony Branche saw a man with glasses shoot the victim.

On cross-examination, the Petitioner conceded that trial counsel's investigator met with Mark Tolley before trial. He testified that he would be surprised to learn that Tolley told the investigator that the Petitioner dictated the statement Tolley gave police. Moreover, the Petitioner confirmed that he and Anthony Branche were friends prior to

the offense but denied that Anthony was trying to protect him by telling police that the victim's shooter was wearing glasses.

Following arguments from counsel, the post-conviction court took the matter under advisement and denied relief in a written order on August 25, 2015. The Petitioner was appointed appellate counsel and a timely notice of appeal was filed on September 3, 2015.

## ANALYSIS

The Petitioner contends that trial counsel provided ineffective assistance by failing to (1) discover Joshua Branche's third statement to law enforcement, (2) call Anthony Branche as a defense witness, and (3) call Mark Tolley as a defense witness.[3] He asserts that but for these failures on the part of trial counsel, the outcome of his trial would have been different. The State argues that the post-conviction court properly denied relief. Upon review, we agree with the State.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal citations and quotation marks omitted); Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010); See Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011). A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562

---

[3] We note that counsel for the Petitioner first submitted his appellate brief on February 10, 2016, but the brief was stricken from the record for being "inexcusably substandard." Counsel submitted an amended brief, which was filed on July 14, 2016.

(Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Vaughn, 202 S.W.3d at 116 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975); Strickland v. Washington, 466 U.S. 668, 687 (1984)). A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694). Moreover,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Id. at 370 (citing Strickland, 466 U.S. at 697).

The Petitioner contends that trial counsel did not adequately investigate and prepare for trial because he failed to discover the "third statement" Joshua Branche made to law enforcement. Though not apparent from the Petitioner's brief, we have gleaned from the record that he is referring to information contained in the affidavit of complaint against Anthony Branche for false report, reckless endangerment, and unlawful possession of a firearm on the night of the offense. Specifically, the body of the affidavit contained statements from Joshua during an interview with law enforcement on August 15, 2015, in which he stated,

> Anthony was hanging out the passenger side window and had a small pistol in his hand. He stated that Anthony was firing the gun at the people in the vehicle. Joshua stated that when the people started firing back he stopped chasing them because he did not want to get shot.

The statements contained in the affidavit were in contrast to two previous statements by Joshua from August 13, 2005, as well as Joshua's testimony at trial that neither the victim, nor he, nor Anthony had a gun on the night of the offense. The Petitioner

contends that trial counsel's failure to discover and obtain Joshua's "third statement" amounted to deficient performance. In support, the Petitioner points to statements by trial counsel indicating that he was unaware of the third statement.

In denying relief, the post-conviction court determined "that [trial counsel] was aware of the information in the affidavit of complaint, and that he successfully impeached Joshua Branche with his other prior statements, prior testimony at the preliminary hearing, and with his criminal history." We acknowledge that trial counsel did not question Joshua about the conflicting statements that appear in the affidavit of complaint during cross-examination in response to Joshua's denial that guns were involved. Furthermore, counsel did not present the fact that Anthony Branche was convicted of unlawful possession of a weapon on the night of the offense to the jury, a fact that further undermines the testimony that Anthony Branche did not have a gun on the night of the offense.

Nevertheless, we conclude that the Petitioner has failed to demonstrate any prejudice in relation to this issue. Here, it is undisputed that the Petitioner and his co-defendant were present at victim Anthony Branche's home in an attempt to burglarize it on the night of victim Mottern's death. Once the Petitioner's plan was foiled, victim Mottern chased him into the field where the victim was fatally shot as a result of "loose gunshot wound to the chest --- meaning that the muzzle of the gun was against his skin when the gun discharged." Bryan Keith Good, 2010 WL 3706625, at *6. In our view, even if Joshua's third statement acknowledging his brother's possession of a gun was presented to the jury, it would have been of little import because the gunfire exchange between the Petitioner/co-defendant and the Branche brothers would have occurred after the victim was killed at close range in the field. In addition, there was other testimony at trial regarding the use of guns by the Branche brothers. The Petitioner and Nutter testified that the car chasing them from the field was shooting at them and that they needed to return fire. Andrew Atkins also testified that the Branche brothers had a reputation for being drug dealers who were always armed. Finally, trial counsel cross-examined Joshua Branche extensively during trial regarding his and his brother's use of guns on the night of the offense. Trial counsel testified that, based on the verdict, the jury appeared to have discredited Joshua Branche's testimony that no weapons were involved. The post-conviction court noted, and we agree that "[a]s a result of trial counsel's performance, the Petitioner was acquitted of first degree murder and convicted of the lesser offense of criminally negligent homicide[.]" Given this favorable result, counsel's failure to question Joshua Branche specifically about the statements in the affidavit of complaint was not prejudicial. Accordingly, he is not entitled to relief on this issue.

Next, the Petitioner argues that trial counsel was ineffective in failing to call Anthony Branche as a witness at trial. The Petitioner contends that Anthony's account of

-15-

the offense "could have been crucial for the defense," noting that Anthony admitted to firing shots at the Petitioner and gave a description of the victim's shooter that matched the Petitioner's co-defendant. In denying relief, the post-conviction court found that Anthony "had no credibility at all" and that trial counsel made a strategic decision not to call him to testify as a witness at trial. The record does not preponderate against the post-conviction court's findings. Here, trial counsel, whose testimony the post-conviction court credited, testified that he discussed the reliability of Anthony's testimony with the Petitioner, and the Petitioner conceded at the post-conviction hearing that neither he nor counsel knew what Anthony would have said at trial. Counsel further stated that he did not think it was strategic to call a victim of the offense as a defense witness and that he would "get more" from emphasizing the fact that the State did not call Anthony. Moreover, trial counsel did not feel that Anthony's testimony would have changed the outcome of the Petitioner's trial given that the Petitioner was convicted of the lesser offense of criminally negligent homicide and because it was undisputed that the Petitioner was present at the time of the victim's shooting. Based on the proof, we agree with the post-conviction court that counsel made an informed, tactical decision not to call Anthony on behalf of the defense at trial. Accordingly, the Petitioner is not entitled to relief on this issue.

Lastly, the Petitioner claims that trial counsel was ineffective in failing to call Mark Tolley as a defense witness at trial. He concedes that it was not counsel's fault that Tolley "got cold feet," but he maintains that counsel should have subpoenaed his testimony. Although trial counsel was not questioned regarding this issue, the post-conviction court determined that "[b]ased on the Petitioner's testimony, trial counsel obviously did not call Tolley as a part of his trial strategy since the witness was apparently not going to give beneficial testimony to the Petitioner's case." The record does not preponderate against the findings of the post-conviction court. To the extent that the Petitioner is arguing that trial counsel should have put forth proof that his co-defendant admitted to shooting the victim, the Petitioner is not entitled to relief because Gary Daugherty testified at trial that Nutter told him that Nutter shot a man in self-defense because that man was trying to cut him. In addition, the Petitioner failed to call Tolley as a witness at the post-conviction hearing or otherwise demonstrate how Tolley's testimony would have changed the outcome of his trial. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner."). Accordingly, he is not entitled to relief.

## CONCLUSION

Upon review, the judgment of the post-conviction court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE